DONALD MABRY, Special Adm'r for the Estate of Ada Pinkston, Plaintiff-Appellee, v. THE COUNTY OF COOK *et al.*, Defendants-Appellants.

First District (1st Division)   No. 1—98—4371

Opinion filed June 30, 2000.

44

Richard A. Devine, State's Attorney, of Chicago (Patricia M. Shymanski and Peter D. Fischer, Assistant State's Attorneys, of counsel), for appellants.

Joel H. Greenburg, Ltd., of Chicago (Joel H. Greenburg and Mark Szaflarski, of counsel), for appellee.

PRESIDING JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiff, Donald Mabry, brought this medical malpractice action against defendants, County of Cook and Cook County Hospital, seeking damages for the death of his mother, Ada Pinkston (Pinkston). Following a jury trial, the jury rendered a verdict in favor of plaintiff and awarded damages of $750,000. The trial court entered judgment on the verdict and denied defendants' posttrial motion.

Defendants now appeal the jury verdict and raise one issue for review. Defendants argue that they are immune from liability under sections 6—105 and 6—106 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/6—105, 6—106 (West 1996)), because plaintiff's medical malpractice cause of action alleged negligence in defendants' physicians' failure

to diagnose Pinkston's pulmonary embolism, the medical disease that caused her death. Plaintiff argues that defendants are not immune from liability because defendants' negligent conduct included a failure to follow up an ordered test and engage in a proper course of treatment while Pinkston was hospitalized at Cook County Hospital.

Defendants do not dispute the evidence about their treatment of Pinkston but contend that her death resulted from a failure to diagnose the ailment that caused her death and not a failure or omission in the treatment provided. Defendants argue that they gave Pinkston proper treatment for her asthmatic condition, the only ailment that they diagnosed, and thus any liability imposed on them is a result of their failure to diagnose Pinkston's pulmonary embolism and their failure to perform an adequate physical examination. They contend that they cannot be held liable for these acts or omissions under sections 6—105 and 6—106(a).

## FACTS

The relevant facts at trial established that on April 30, 1992, Pinkston went to the emergency room of Cook County Hospital. She complained of dizziness and dyspnea or shortness of breath. She was initially diagnosed with asthma and given a peak flow test to measure her expiratory flow rate. Pinkston's test reflected a rate of 250 and was slightly below normal but not particularly low.

The attending physician in the emergency room, Dr. Kling, ordered an EKG, the drawing of arterial blood gases (ABG), and a chest X ray. The ABG blood test analyzes and determines the oxygen status of the patient and how well the patient is breathing. The test revealed a below normal amount of oxygen in Pinkston's blood stream, and Dr. Kling ordered Pinkston to receive oxygen by nasal cannula. Based on Pinkston's medical history and his clinical findings, Dr. Kling diagnosed Pinkston with asthma and respiratory distress. Dr. Kling testified that he also made a differential diagnosis, which accounts for other medical conditions that may contribute to the patient's present symptoms and complaints. Dr. Kling considered other ailments such as allergies, tuberculosis, tumors, infections, pneumonia, viruses, and congestive heart failure.

Dr. Kling acknowledged that Pinkston's chart did not indicate that the ailment of pulmonary embolism was considered, but he believed its risk factors were reviewed. According to Dr. Kling, the most common risk factors of a pulmonary embolism are obesity, broken bones, cancer, and deep vein thrombosis, because these conditions all enable blood clots to form in the extremities. Once the blood clot forms, it then travels into the lungs. Dr. Kling testified that Pinkston did not

have these risk factors. Dr. King also noted that a pulmonary embolism may mimic the symptoms of asthma and other medical ailments.

Pinkston additionally received a chest X ray in the emergency room and it showed a three-by-four-centimeter rounded soft tissue density in the right hilum, the area of the lungs where the pulmonary artery enters. Dr. Kling spotted the soft tissue density, identified it as a hilar density or mass, and diagnosed causes of the condition as either lymph node enlargement, infection, or malignancy. Based on Pinkston's medication, medical history and bilateral expiratory wheezing, Dr. Kling diagnosed Pinkston with asthma and did not diagnose any pulmonary embolism. Dr. Kling testified that he did not diagnose a pulmonary embolism because Pinkston did not have the risk factors associated with this condition.

Dr. Mohammed Nassem, a radiologist, reported to the emergency room doctors that the soft hilar density noted on Pinkston's X ray could be a tumor or a lymph node enlargement. Based only on an X ray, Dr. Nassem could not tell if the hilar density was a pulmonary embolism. Dr. Nassem believed that tests such as a VQ scan or an angiogram could appropriately identify an embolism if suspected. Pinkston was not given these tests. Dr. Kling reviewed the radiologist's report and believed that the hilar mass could be, among other ailments, a malignancy, tuberculosis, or some other infection or inflammation. Dr. Kling did not believe it required immediate treatment or care.

Because of the lack of significant improvement in her blood gas series, Pinkston was admitted to Cook County Hospital on May 1, 1992, and eventually transferred to the family practice ward. Pinkston was initially under the care of Dr. Ferro, a first-year resident. Dr. Ferro conducted a complete examination of Pinkston and obtained a medical history. Dr. Ferro found Pinkston's chest sounds revealed mucus in both lungs, consistent with a diagnosis of asthma. An examination of Pinkston's legs showed no signs of deep vein thrombosis and thus no evidence of a pulmonary embolism. Dr. Ferro also noted the right hilar density. Later that day, Dr. Kurashi, a third-year resident, gave Pinkston a complete physical examination. Dr. Kurashi found occasional bilateral wheezing in Pinkston's lungs, which is common in asthmatics, and, like Dr. Ferro, did not find any evidence of deep vein thrombosis.

Both Dr. Ferro and Dr. Kurashi filled out an assessment and treatment plan report. They both first listed a diagnosis of asthma and called for a plan to continue to treat Pinkston with prednisone, an anti-inflammatory steroid and an alupent nebulizer. Both doctors next noted treatment to rule out a possible heart attack and to evaluate di-

abetes because Pinkston came to the emergency room with a low sugar count. Dr. Ferro and Dr. Kurashi, however, listed the right hilar density as a lower priority and indicated in their reports "will follow up."

At 10 a.m. on May 2, 1992, Dr. Ferro conducted another examination of Pinkston and continued to believe that she was suffering from an acute exacerbation of asthma. While the plan was to continue to treat Pinkston with steroids and nebulizers, Dr. Ferro included a requisition to do a CAT scan of the chest to rule out cancer. Dr. Ferro marked the box "stat" on the requisition form, which he routinely did, but stated his request was not urgent. The CAT scan was never performed. Prior to treating Pinkston, Dr. Ferro had never treated a patient with a pulmonary embolism and did not see any evidence in his treatment of Pinkston to indicate a diagnosis of pulmonary embolism.

On May 3, 1992, at 9:30 a.m., Dr. Fillai, a second-year resident, examined Pinkston. He noted that the patient was feeling better, her blood pressure was high, and her heartbeat was slightly above normal. However, these readings were consistent with the medication Pinkston was taking for asthma. Dr. Fillai discontinued the oxygen by nasal cannula. The examination further revealed bilateral wheezing and a regular rate and rhythm of the cardiovascular system. Dr. Fillai never diagnosed Pinkston with a pulmonary embolism.

In the afternoon of May 3, 1992, Dr. Kurashi examined Pinkston and believed her condition had improved. Pinkston told Dr. Kurashi that she felt fine and did not need her oxygen. Plaintiff also visited Pinkston in the early afternoon and thought she seemed depressed. Plaintiff did not speak to any doctors. Pinkston's condition then became critical and she died later that day as a result of the pulmonary embolism.

Plaintiff's expert, Dr. Eugene Saltzberg, testified that he practices emergency room medicine at Condell Medical Center. Dr. Saltzberg testified that the cause of Pinkston's death was a pulmonary embolism. Dr. Saltzberg defined a pulmonary embolism as a blood clot that typically forms in the legs and travels through the venous system to the right side of the heart. The blood clot then leaves the heart and enters the pulmonary vasculate, causing an obstruction of the blood flow to the right side of the lungs. Dr. Saltzberg testified that a pulmonary embolism is a serious condition that requires immediate hospitalization and treatment with medication to prevent the blood from clotting. He noted the symptoms for asthma and a pulmonary embolism are similar.

Dr. Saltzberg further explained that a differential diagnosis is a list of diagnoses developed after examining a patient. When a patient

enters the emergency room with shortness of breath, as Pinkston did, Dr. Saltzberg testified that the standard of care for an emergency room physician requires a differential diagnosis. Dr. Saltzberg opined, to a reasonable degree of medical certainty, that Dr. Kling violated the standard of care by not performing a proper differential diagnosis. Dr. Saltzberg additionally opined that the defendants' initial physicians in the emergency room did not take a proper history from Pinkston to determine that she suffered from a pulmonary embolism rather than from asthma.

Dr. Saltzberg testified, to a reasonable degree of medical certainty, that Dr. Kling misinterpreted the arterial blood gases and the notation of a hilar density. Dr. Kling further violated the standard of care by not ordering a lung scan and following up on the hilar density. Moreover, according to Dr. Saltzberg, Pinkston showed no signs of improvement during her hospitalization and typically an asthmatic will improve within 24 hours of being hospitalized. Defendants thus failed to recognize that Pinkston's recent complaint of bilateral wheezing, blood gas results, and lack of improvement indicated that she did not suffer from asthma but from a different medical condition. Dr. Saltzberg further testified, to a reasonable degree of medical certainty, that defendants' physicians violated the standard of care by not following through with the ordered CAT scan and this failure proximately caused Pinkston's death. Dr. Saltzberg noted that no physician followed up on the hilar density and opined that defendants violated the standard of care by failing to conduct any pulmonary embolism tests, such as a lung scan, during the course of Pinkston's hospital stay. Dr. Saltzberg then testified as follows:

"Q. To a reasonable degree of medical certainty more probably true than not, did these deviations from the standard of care—did the physicians deviate from the standard of care in failing to determine the cause of Ada Pinkston's shortness of breath?

A. Yes.

\* \* \*

Q. Doctor, can you explain to us how so many physicians can miss the diagnosis of pulmonary embolism?

A. Well, the reason so many physicians can miss the diagnosis is, unfortunately, each of the physicians who saw the patient was relying on the physician who saw the patient before them in having made the right diagnosis. And so there was a sort of a *spiral of failure to diagnose* her problem, and each doctor kind of went along into that spiral by assuming that her underlying problem was asthma and then treating her for asthma and *never pursuing any other diagnostic possibilities.*" (Emphasis added.)

During the jury instruction conference, defendants requested that

the jury answer five questions within a submitted special interrogatory. The questions requested the jury to determine if Pinkston had asthma; whether the treatment of asthma was appropriate; and whether the defendants were negligent for failing to prescribe treatment for or diagnose the pulmonary embolism after April 30, 1992. Defendants argued that the special interrogatory was necessary and relevant to its claim of immunity under the Tort Immunity Act. The trial court, however, rejected the special interrogatory and denied defendants' request to submit it.

After closing arguments the jury received the following instruction as to the defendants' negligence:

"The plaintiff, Donald Mabry, as Special Administrator of the Estate of Ada Pinkston, deceased, claims that Ada Pinkston died, and that the defendant was negligent in one or more of the following respects:

Improperly failed to treat Ada Pinkston's right hilar density;

Improperly failed to treat Ada Pinkston's shortness of breath;

Improperly failed to diagnose Ada Pinkston's pulmonary embolism.

The plaintiff further claims that the foregoing was a proximate cause of the death of Ada Pinkston."

These claims of negligence mirrored the allegations within plaintiff's first amended complaint which alleged that defendants:

"a. Carelessly and negligently failed to treat Decedent condition [*sic*] of shortness of breath;

\*\*\*

c. Carelessly and negligently failed to treat Decedent condition [*sic*] of right lung hilar mass, including failing to perform follow-up lung studies as prescribed;

\*\*\*

e. Carelessly and negligently failed to diagnose and treat Decedent's pulmonary embolism."

After deliberations, the jury found in favor of the plaintiff and awarded damages of $750,000. The trial court entered judgment on the verdict and denied defendants' posttrial motion which again raised defendants' claim of immunity under the Tort Immunity Act. Defendants then filed this appeal.

## ANALYSIS

■ Defendants argue that they are immune from liability because "during the trial every criticism made by plaintiff was an attack on the alleged misdiagnosis of asthma and the consequent failure to diagnose a pulmonary embolism." Defendants cite sections 6—105 and 6—106(a) of the Tort Immunity Act (745 ILCS 10/6—105,

6—106(a) (West 1996)). When interpreting the Tort Immunity Act, the supreme court has directed courts to "seek the legislative intent primarily from the language used in the Tort Immunity Act \*\*\*. If [the court] can ascertain the legislative intent from the plain language of the [Tort Immunity] Act itself, that intent must prevail \*\*\*." *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 193 (1997). The interpretation of the Tort Immunity Act is a question of law and our review is *de novo. Barnett v. Zion Park District*, 171 Ill. 2d 378, 385 (1996).

Recently, this court and our supreme court interpreted sections 6—105 and 6—106 of the Tort Immunity Act and addressed similar arguments raised in this appeal. *Michigan Avenue National Bank v. County of Cook*, 306 Ill. App. 3d 392 (1999), *aff'd*, 191 Ill. 2d 493 (2000). In *Michigan Avenue National Bank*, plaintiff, special administrator of the estate of Cynthia Collins, brought a medical malpractice action against the County of Cook (County) regarding treatment Collins received at Cook County Hospital. Plaintiff alleged in part that the County " 'failed to properly and adequately perform examinations and tests on decedent'; \*\*\* 'failed to diagnose decedent's condition of breast cancer' "; and " 'failed to administer proper, appropriate and necessary medical and nursing care \*\*\* to the decedent.' " *Michigan Avenue National Bank*, 191 Ill. 2d at 499. Determining the County was immune from these allegations of negligence under sections 6—105 and 6—106(a), the supreme court affirmed the trial court's grant of summary judgment in favor of the County. 745 ILCS 10/6—105, 6—106(a) (West 1996).

In *Michigan Avenue National Bank*, Collins made several visits to Cook County Hospital and a clinic operated by the hospital between September 22, 1986, and February 10, 1987. Collins originally was treated in September 1986 at the Fantus Family Planning Clinic, and following referral because of a left breast mass, was treated at the breast clinic of Cook County Hospital. At the breast clinic, Collins was examined, released, and instructed to return in a three-month period, which Collins never did. In December 1986, Collins received treatment and physical examinations at Cook County Hospital for sore breasts and other gynecological complaints. In January 1987, Collins visited the prenatal clinic of Cook County Hospital and was further examined. The examination of Collins indicated that Collins had a cyst in her inner, mid right breast, but no treatment was rendered to Collins' breasts. On February 10, 1986, Collins was again examined at the Fantus health center because of her complaints. The doctor's examination indicated that Collins' breasts were "within normal limits," and Collins was instructed to return to the clinic in one year. *Michigan Avenue National Bank*, 191 Ill. 2d at 498.

Collins became pregnant in August 1987, received treatment from a different hospital, and delivered the child in May 1988. In July 1988, a lump in Collins' breast was diagnosed as cancerous. Eventually, the cancer spread and, despite a mastectomy and other cancer treatment, Collins died in November 1989. *Michigan Avenue National Bank*, 191 Ill. 2d at 499. Based on affidavits and deposition testimony of two experts, plaintiff alleged that the County and its physicians deviated from the standard of care by failing to perform a proper breast examination; failing to schedule additional visits; and failing to a order diagnostic tests, such as a mammogram, an ultrasound, or a biopsy. In essence, plaintiff claimed, and the County did not dispute, a complete failure by the County physicians to diagnose breast cancer, order appropriate tests to determine this medical condition, and require Collins to receive immediate follow up treatment.

■ The supreme court first discussed the scope of section 6—105 of the Tort Immunity Act (745 ILCS 10/6—105 (West 1996)). It states:

> "Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." 745 ILCS 10/6—105 (West 1996).

Plaintiff argued that, based on its title, this section applied only to examinations conducted for preventive measures to the public at large. The supreme court rejected this argument and found no ambiguity in the text of the statute. Applying the plain language of the statute, it found section 6—105 conferred immunity upon public officials who have failed to make a physical or mental examination, or who have failed to make an adequate physical or mental examination. *Michigan Avenue National Bank*, 191 Ill. 2d at 505. Thus, the immunity of section 6—105 extends "to any physical or mental examination, whether preventive or for purposes of treatment." *Michigan Avenue National Bank*, 306 Ill. App. 3d at 401.

■■ The supreme court next addressed the scope of the immunity of section 6—106(a) as compared to the limitation of immunity within sections 6—106(c) and (d). Section 6—106 states as follows:

> "(a) Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction.
>
> (b) Neither a local public entity nor a public employee acting

within the scope of his employment is liable for administering with due care the treatment prescribed for mental or physical illness or addiction.

(c) Nothing in this section exonerates a public employee who has undertaken to prescribe for mental or physical illness or addiction from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury.

(d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental or physical illness or addiction or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury." 745 ILCS 10/6—106 (West 1996).

The court first rejected the argument that section (d) restricted the scope of or even eliminated the immunity of section (a). The court found that the unambiguous language of section 6—106(a) extends immunity to a public official's misconduct for failing to diagnose a medical condition and prescribe treatment for that medical condition. *Michigan Avenue National Bank*, 191 Ill. 2d at 510. According to the court, section 6—106(a) immunizes three areas of specific conduct from liability: "(1) a diagnosis that a person is afflicted with a mental or physical illness or addiction; (2) failing to diagnosis that a person is afflicted with a mental or physical illness; and/or (3) failing to prescribe for a mental or physical illness or addiction." *Michigan Avenue National Bank*, 191 Ill. 2d at 510. The court also found no ambiguity in the term "diagnosis." It noted several definitions of "diagnosis." These definitions included the " 'art or act of identifying a disease from its signs or symptoms' " and " 'the art of distinguishing one disease from another.' " *Michigan Avenue National Bank*, 191 Ill. 2d at 510, quoting Webster's Third New International Dictionary 622 (1993) and Sloan-Dorland Annotated Medical-Legal Dictionary 1999 (1987).

However, examining the other subsections of section 6—106, the court determined that section 6—106 does not provide blanket immunity to public officials and entities. The court held that the immunity of section 6—106 does not extend to "public employees [that] have caused a person to suffer injury due to the negligent prescription of treatment and/or the negligent administration of treatment." *Michigan Avenue National Bank*, 191 Ill. 2d at 511. The court further found the term "treatment" unambiguous and again noted several definitions of "treatment." For instance, Webster's dictionary defines "treatment" as "the action or manner of treating a patient medically or surgically." Webster's Third New International Dictionary 2435

(1993). Sloan-Dorland Dictionary defines "treatment" as "[t]he management and care of a patient for the purpose of combating disease or disorder." Sloan-Dorland Annotated Medical-Legal Dictionary 746 (1987).

Applying these principles, the supreme court in *Michigan Avenue National Bank* held that defendants were immune from the allegations and evidence of its negligence toward Collins. The court found that "[b]ecause the gravamen of plaintiff's actions against defendants is that defendants' failure either to perform examinations *** led to defendant's failure to diagnose Collins' breast cancer, which, in turn, proximately caused her death, the immunity provided to local public entities and their public employees in section 6—105 and subsection (a) of section 6—106(a) applies." *Michigan Avenue National Bank*, 191 Ill. 2d at 512. The court rejected the argument that plaintiff's cause of action was for negligent treatment. Its pleadings alleged a failure to diagnosis breast cancer. In addition, its expert's testimony about violations of the standard of care "only related to defendants' failure to examine Collins and diagnose her breast cancer." *Michigan Avenue National Bank*, 191 Ill. 2d at 514. Plaintiff's experts further concluded that defendants' "failure to conduct appropriate testing in order to diagnose the breast cancer in 1986 was the proximate cause of Collins' death." *Michigan Avenue National Bank*, 191 Ill. 2d at 515.

■ In this case, like *Michigan Avenue National Bank*, we believe that plaintiff's entire cause of action is premised on defendants' failure to diagnose the pulmonary embolism and the failure to conduct physical examination tests that would have enabled the County physicians to discover that Pinkston had a pulmonary embolism. Accordingly, the defendants are immune from liability under sections 6—105 and 6—106(a).

Dr. Saltzberg's testimony unequivocally established that the County physicians improperly diagnosed Pinkston with asthma and never diagnosed her with her true ailment of a pulmonary embolism. Although the symptoms for asthma and pulmonary embolism are similar, Dr. Saltzberg testified that, based on Pinkston's history, blood gas levels, hilar density, and lack of health improvement during her hospitalization, a physician acting within the standard of care would have diagnosed a pulmonary embolism and prescribed treatment of the pulmonary embolism. According to Dr. Saltzberg, none of the County physicians, however, diagnosed the pulmonary embolism or implemented a course of treatment for the pulmonary embolism. In addition, Dr. Saltzberg's opinions are reflected both in plaintiff's first amended complaint, where plaintiff alleges a negligent and careless failure to diagnose, and in the jury instructions, requiring the jury to

find defendants negligent if it found that defendants "improperly failed to diagnose Ada Pinkston's pulmonary embolism."

Plaintiff attempts to circumvent section 6—106(a) by arguing that defendants diagnosed the shortness of breath and hilar density but failed to treat these conditions. It is true that the County physicians treated Pinkston's shortness of breath but it was only treated as a symptom of asthma. The plain meaning of "diagnosis" within section 6—106(a) grants immunity to acts or omissions in " 'identifying a disease from its signs and symptoms' " or determining " 'a medical condition (such as disease) by physical examination or by study of its symptoms.' " *Michigan Avenue National Bank*, 191 Ill. 2d at 510, quoting Webster's Third New International Dictionary 622 (1993) and Black's Law Dictionary 464 (7th ed. 1999). Plaintiff thus confuses a symptom of an ailment with an actual medical condition. Defendants' physicians determined that the shortness of breath was a symptom of asthma and treated Pinkston *only* for the asthma. The County physicians treated the shortness of breath as asthma, and plaintiff does not claim that defendants' treatment of plaintiff's asthmatic condition violated the standard of care. Plaintiff also does not claim that the prescription of treatment or the administration of treatment for the asthma proximately caused Pinkston's pulmonary embolism. Moreover, while the County physicians noted the hilar density, they failed to diagnose its cause and failed to treat it. The hilar density was in fact the pulmonary embolism. Dr. Saltzberg testified that the only appropriate treatment for this condition was an anticoagulant, such as heparin, and the County physicians never administered or prescribed this treatment.

While Dr. Kling recognized that the shortness of breath may also be a symptom of a pulmonary embolism, he testified that, because of the lack of other risk factors associated with a pulmonary embolism in his examination of Pinkston, he never diagnosed this condition and only began a course of treatment for asthma. Dr. Kling also testified that he believed that the hilar density constituted a symptom of either a malignancy, an infection, or an inflammation and was not related to a symptom of pulmonary embolism. The record reflects that Dr. Kling diagnosed asthma and determined that Pinkston's symptoms were inconsistent with a pulmonary embolism. Dr. Kling failed to diagnose a pulmonary embolism.

Moreover, both Dr. Ferro and Dr. Kurashi additionally diagnosed *only* asthma and treated Pinkston with an anti-inflammatory steroid and an alupent nebulizer for the diagnosed asthma ailment. These two physicians, who examined Pinkston after her hospitalization and after Dr. Kling's emergency room treatment, admitted that they never

considered a pulmonary embolism and never prescribed a course of treatment for a pulmonary embolism. They noted the hilar density but believed that it was related to a lymph node problem or evidence of cancer. Both physicians gave the hilar density a low priority and indicated that they would eventually "follow it up." Dr. Ferro and Dr. Kurashi failed to diagnose a pulmonary embolism. Neither Dr. Ferro nor Dr. Kurashi, however, treated the hilar density or connected the hilar density to a pulmonary embolism. Here, Pinkston was diagnosed with asthma and not a pulmonary embolism. Dr. Saltzberg's testimony determined negligence in the complete failure to diagnose the pulmonary embolism and not the commission of negligence in a course of treatment.

We further note that the allegations in plaintiff's amended complaint and the jury instructions reference a failure to treat Pinkston's shortness of breath and right hilar density. However, the evidence at trial established that defendants' treatment for these conditions was not negligent and did not proximately cause Pinkston's death. Rather, according to Dr. Saltzberg's testimony, the negligence in this case was based on the County physicians' failure to diagnose these conditions as symptoms of the pulmonary embolism and failure to administer the proper course of treatment toward the pulmonary embolism and its symptoms. This claim of negligence therefore seeks to establish liability for a failure to diagnose and a failure to prescribe for a physical illness and directly falls within the specific areas of conduct that section 6—106(a) immunizes. Negligent prescription of treatment is different from failure to prescribe treatment as the result of a failure to diagnose. Immunity under section 6—106 does not extend to public employees that have caused a person to suffer injury due to the negligent prescription of treatment. Here, the claim of negligence seeks to establish liability, not for negligent prescription of treatment, but for failure to diagnose and failure to prescribe treatment, and that conduct is immune under section 6—106(a).

At trial, defendants disputed plaintiff's claim of negligence and argued that the County physicians acted within the standard of care, diagnosed Pinkston's asthmatic condition, and properly treated that asthma. We note whether plaintiff suffered from both asthma and a pulmonary embolism or the pulmonary embolism by itself is irrelevant to our analysis under section 6—106(a). No evidence below established that the treatment for Pinkston's asthma was negligent, improper, or related to the lack of treatment for the pulmonary embolism. The conflicting testimony below only indicates that Pinkston may have had coexisting ailments and only one of these ailments, asthma, was diagnosed. The treatment for asthma was simply unrelated to the al-

legations of negligence in the misdiagnosis of the pulmonary embolism. The supreme court noted that section 6—106(a) immunity extends to a case of misdiagnosis. *Michigan Avenue National Bank*, 191 Ill. 2d at 514. Here, the County physicians misdiagnosed the actual ailment that caused Pinkston's death. They, however, never began a course of prescribed treatment for the pulmonary embolism, and no evidence points to any negligence in the course of treatment for asthma.

Plaintiff cites *Lloyd v. County of Du Page*, 303 Ill. App. 3d 544 (1999), to support his claim that under section 6—106(d) defendants are liable because they negligently administered a prescribed course of treatment. In *Lloyd*, plaintiff alleged a series of negligent acts to plaintiff's decedent while admitted and under the supervision of employees of the county-owned and operated convalescent center. These allegations included improper transporting of decedent, overmedicating decedent, and a failure to notice bed sores, weight loss, and a number of infectious processes. Reversing the trial court's grant of defendants' section 2—615 motion to dismiss plaintiff's complaint, the appellate court noted that plaintiff's allegations of negligence were directed at defendants' employees and not at any physicians. The court stated: "[The] Convalescent Center and its employees were involved in rendering nursing care to patients and not in diagnosing and prescribing treatments. Those acts were the function of the decedent's physicians." *Lloyd*, 303 Ill. App. 3d at 551.

Here, plaintiff's allegations of negligence are directed solely at the conduct of Pinkston's physicians. Plaintiff's expert witness found no fault in the treatment given to Pinkston at Cook County Hospital by the nonphysician employees. Rather, plaintiff's cause of action is solely directed at the conduct of the County physicians. Dr. Salzberg opined that each and every County physician assigned to Pinkston violated the standard of care by failing to diagnose the pulmonary embolism. Unlike *Lloyd*, we are not limited to the allegations of plaintiff's complaint but have before us the trial testimony of plaintiff's expert witness. Plaintiff's evidence at trial failed to establish any negligence in the administering or prescription of treatment to Pinkston.

Furthermore, plaintiff's attempt to distinguish *Michigan Avenue National Bank* are unpersuasive. Plaintiff argues that, unlike Collins in *Michigan Avenue National Bank*, Pinkston was hospitalized and the County physicians undertook a course of treatment. A closer look at *Michigan Avenue National Bank*, however, demonstrates that Collins was repeatedly examined for her complaints and symptoms in 1986 and 1987. Collins received treatment at both the County hospital and at a County clinic. *Michigan Avenue National Bank*, 191 Ill. 2d at

498. Despite these visits and repeated examinations by County physicians, Collins simply was never diagnosed with breast cancer and given the necessary medical tests to discover her breast cancer. The alleged negligence in that case, like here, was not based on the treatment Collins received, but on the treatment that Collins should have received and the diagnosis the County physicians should have made in light of her symptoms. The medical experts in *Michigan Avenue National Bank* found Collins' physicians violated the standard of care because they had evidence of cancer but did nothing to pursue this diagnosis nor did they conduct the appropriate tests to diagnose cancer. *Michigan Avenue National Bank*, 191 Ill. 2d at 515. The record in that case additionally contained no evidence of negligence in the course of any treatment. *Michigan Avenue National Bank*, 191 Ill. 2d at 515-16.

Likewise, in this case, plaintiff alleged no negligence in the treatment Pinkston received for her diagnosed asthmatic condition and the record is devoid of any negligence in the course of any treatment. Like Collins in the *Michigan Avenue National Bank* case, the negligence here is not based on the treatment Pinkston received, but on the treatment Pinkston should have received and the diagnosis the County physicians should have made. The essence of plaintiff's suit is a failure to properly diagnosis Pinkston with a pulmonary embolism. Dr. Saltzberg testified that, based on the symptoms she presented and the diagnosis of asthma, the County physicians properly hospitalized her for her asthmatic condition. This treatment, however, was not negligent and did not affect or exacerbate the pulmonary embolism. Rather, plaintiff's claim of malpractice focused on the failure to diagnose the pulmonary embolism, the lack of treatment or prescribed course of treatment for the hilar density, the failure to perform the CAT scan, and the failure to give the appropriate pulmonary embolism tests. This lack of treatment was the direct result of a failure to properly diagnose the pulmonary embolism. Consequently, the fact that defendants treated Pinkston for a separate or coexisting ailment, asthma, does not negate the clear immunity of section 6—106(a) for their failure to diagnose the fatal pulmonary embolism.

■ Moreover, plaintiff argues that defendants are liable for their failure to follow through with the ordered CAT scan because the test was ordered during a course of treatment. Dr. Saltzberg testified that the CAT scan, although not the best test, could have given the County physicians more evidence to assist them in diagnosing the pulmonary embolism. The alleged negligence consisted of the failure of defendants to engage in a course of diagnostic care that would have led them to the actual medical illness, which, in this case, was the pulmonary embolism. Plaintiff admits as much by stating that "following through on

the treatment of the right hilar density would have resulted \*\*\* in the diagnosis of the pulmonary embolism and the administering of life saving heparin." Plaintiff's claim of malpractice and the opinions of his expert witness are based on defendants' failure to diagnose the pulmonary embolism. Section 6—106(a) of the Tort Immunity Act grants immunity to the defendants from liability for this type of omission.

In addition, section 6—105 grants immunity to a public official for the failure to conduct a physical examination or the adequacy of any physical examination conducted. 745 ILCS 10/6—105 (West 1996). This immunity extends to a failure to perform testing or adequately perform testing as part of a physical examination. *Michigan Avenue National Bank*, 191 Ill. 2d at 516. A CAT scan is a diagnostic test to determine what, if any, medical condition exists and should be diagnosed. In this case, the CAT scan was ordered as part of a physical examination of Pinkston for the purpose of ruling out any cancer in her lungs. Because section 6—105 immunizes defendants from their failure to perform testing as part of a physical examination, defendants cannot be held liable for their failure to perform a CAT scan.

While plaintiff correctly points out that the evidence in *Michigan Avenue National Bank* indicated that Collins' fibrocystic disease was not treatable, the evidence never indicated that Collins' breast cancer was not treatable when she initially sought treatment from the County physicians. During their course of examinations and diagnosis of Collins' medical condition, the County physicians failed to diagnose the cause of her symptoms, breast cancer, and, as a result, did not begin a course of treatment to contain or negate the cancer in order to save her life. Similarly, in this case, the County physicians failed to diagnose the pulmonary embolism, and, as a result, did not administer Pinkston life-saving medication or treatment that could have prevented her death. Dr. Saltzberg explained that each County physician gave too much reliance to the initial diagnosis of asthma and essentially ignored the signs and symptoms of a pulmonary embolism. Applying the plain language of sections 6—105 and 6—106(a), and the holding of *Michigan Avenue National Bank*, we conclude that defendants are immune from liability from plaintiff's claim that they negligently failed to diagnose Pinkston's pulmonary embolism, and therefore the judgment below cannot stand.

## CONCLUSION

For the reasons previously discussed, defendants are immune from liability from plaintiff's claim of negligence, and therefore the trial court erred in denying defendants' posttrial motion for judgment

notwithstanding the verdict. We reverse the jury verdict in this case, reverse the judgment of the trial court denying the defendants' motion for judgment notwithstanding the verdict, and dismiss plaintiff's cause of action as being barred by the Tort Immunity Act.

Reversed.

RAKOWSKI and TULLY, JJ., concur.