In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 21-2778

DIENNA M. LASH, as Administrator of the Estate of
GLENN LASH, deceased,

*Plaintiff-Appellant,*

*v.*

SPARTA COMMUNITY HOSPITAL DISTRICT,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Southern District of Illinois.
No. 18-cv-1466 — **Mark A. Beatty**, *Magistrate Judge.*

---

ARGUED MAY 16, 2022 — DECIDED JUNE 22, 2022

---

Before EASTERBROOK, BRENNAN, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Glenn Lash, an obese, sixty-year-old man with a remote history of smoking, went to Sparta Community Hospital District ("Sparta hospital") with complaints of shortness of breath and recent chest discomfort. The doctor diagnosed him with an "anxiety reaction." Lash died the next evening of a heart attack. His widow, Dienna Lash, sued the hospital for the alleged negligent acts of its

agents. The district court granted summary judgment for Sparta hospital. We affirm.

## I. Background

Glenn Lash was a sixty-year-old, obese man with a remote history of smoking and high blood pressure. He was traveling from Pennsylvania to Sparta, Illinois for a trap-shooting event when he experienced shortness of breath and chest discomfort. He decided to go to Sparta hospital, a hospital operating under the Illinois Hospital District Act, after the shortness of breath had worsened. There, the hospital staff took Lash's vitals, which were "abnormal," so a nurse ordered an EKG, blood work, and a chest x-ray. The test results revealed no signs of a previous heart attack, but his white blood cells and blood sugar were slightly elevated, suggesting a cardiac event. Based on his chest x-ray, Dr. Robert Panico identified mild congestive failure—a condition where the heart muscle does not properly pump blood—and an enlarged right hilum, a part of the lung. He recommended a CT scan to rule out a mass. Dr. Haresh Motwani, the main physician responsible for treating Lash, diagnosed an "anxiety reaction" and prescribed some medications and instructions for treatment. Neither Dr. Motwani nor the nurses informed Lash of his congestive heart failure prior to his discharge—nor that an enlarged right hilum could mean heart failure or cancer. One nurse mentioned only that Lash was seen for an "anxiety reaction."

The next evening, Lash went into cardiac arrest. He was taken to the emergency room, where he was pronounced dead.

Dienna Lash filed a complaint, on behalf of her husband, alleging medical malpractice against Dr. Motwani and Dr.

Panico,[1] as well as vicarious liability against the hospital based on the actions of its agents and alleged violations of informed consent. *See* 28 U.S.C. § 1332. She alleged that Dr. Motwani and the medical staff learned of Glenn Lash's comorbidities ahead of diagnosis, age, shortness of breath, and chest discomfort; that Dr. Motwani and the staff performed tests revealing hypertension, an elevated white blood cell count, and a hilar enlargement; and that Dr. Motwani was negligent by not including acute cardiopulmonary disease in his diagnosis. Sparta hospital and Dr. Motwani moved for summary judgment together. The district court granted the motion for Sparta hospital and denied the motion for Dr. Motwani. Dr. Motwani later settled the case and was dismissed from the lawsuit with prejudice pursuant to the terms of the settlement agreement. Lash appeals only the claims against Sparta hospital.

## II. Discussion

Lash seeks to hold Sparta hospital liable on two theories: (1) vicarious liability based on the negligence of its agents, Dr. Motwani and the nursing staff,[2] and (2) direct liability for not providing informed consent. *See Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1251 (7th Cir. 2022) ("A federal court sitting in diversity applies state substantive law and federal procedural law."); *cf. Chi. Sch. of Automatic Transmissions, Inc.*

---

[1] Dr. Panico separately moved for summary judgment, without opposition from Lash, which the district court granted.

[2] Sparta hospital disputes that Lash ever pleaded a theory based on the negligent acts of the nursing staff. We assume with skepticism that Lash did so because, as explained below, she cannot overcome the hospital's immunity defense.

*v. Accreditation All. of Career Schs. & Colls.*, 44 F.3d 447, 449 (7th Cir. 1994) (comparing a federal court sitting in diversity jurisdiction to being "a ventriloquist's dummy"). We review a grant of summary judgment de novo and draw all reasonable inferences in favor of the nonmovant. *Lewis v. Indiana Wesleyan Univ.*, No. 21-2327, 2022 WL 2093087, at *2 (7th Cir. June 10, 2022). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022) (internal quotation marks omitted) (quoting *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018)).

### A. The Illinois Tort Immunity Act

Sparta hospital raises various arguments and affirmative defenses to rebut Lash's vicarious-liability theory. We focus on one, the Illinois Tort Immunity Act. Section 6-105 of the Act provides that "a local public entity," such as Sparta Hospital, is not liable

> for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others.

745 ILCS 10/6–105. Section 6-106(a) largely repeats this provision:

> Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction.

*Id.* 10/6–106(a). Section 6-106(d), however, states that the Act does not "exonerate[]" an entity for an "injury proximately caused by [an employee's] negligent or wrongful act or omission in administering any treatment prescribed for mental or physical illness or addiction." *Id.* 10/6–106(d).

In short, local public entities enjoy immunity from liability based on an employee's negligent "diagnosis," not negligent "treatment." *See Mich. Ave. Nat. Bank v. County of Cook*, 732 N.E.2d 528, 535–37 (Ill. 2000); *Johnson v. Bishof*, 33 N.E.3d 624, 640 (Ill. App. Ct. 2015). If the "gravamen" of a claim—that is, its essence or most serious part—concerns an employee's diagnosis, then the entity cannot be liable. *Willis v. Khatkhate*, 869 N.E.2d 222, 229 (Ill. App. Ct. 2007). Conversely, if the "gravamen" involves a treatment for a diagnosed injury, then immunity does not attach; the plaintiff's claim can procced. *Id.* The words "diagnosis" and "treatment" are afforded their plain meanings. *Mich. Ave.*, 732 N.E. at 538–39. A diagnosis is "the 'art or act of identifying a disease from its signs and symptoms,' and as an 'investigation or analysis of the cause or nature of a condition, situation, or problem.'" *Id.* at 538 (quoting Webster's *Third New International Dictionary* 622 (1993)). A treatment is "the action or manner of treating a patient medically or surgically." *Id.* at 539 (quoting Webster's *Third New International Dictionary* 2,435).

Lash's claim concerns an improper diagnosis. The hospital staff attended to Glenn Lash, an obese, older man with a history of smoking with complaints of chest pains; performed multiple diagnostic tests, including an x-ray and vital checks; diagnosed him with anxiety; prescribed medication for anxiety; and finally, gave discharge instructions related to that diagnosis of anxiety. All these measures indicate the staff made only an incorrect diagnosis. Indeed, at no point did anyone at the hospital diagnose Lash with acute cardiopulmonary disease—the disease that proved fatal for him—much less administer treatment for his heart condition.

Lash's own complaint undermines her claim. It takes issue with the "testing performed by Motwani and the staff." But the word "testing" relates to a "diagnosis." A "test" is performed to identify a particular disease. Additionally, the complaint continuously refers to choices "not to include acute cardiopulmonary disease in his differential *diagnosis*," among other similarly worded phrases, such as "failed to address," "failed to consider," and "failed to recognize."

The Illinois Appellate Court's decision in *Mabry v. County of Cook*, 733 N.E.2d 737 (Ill. App. Ct. 2000), closely guides our analysis. There, Ada Pinkson went to the hospital with dizziness and shortness of breath. *Id.* at 739. Her vitals were troubling, and she had numerous other ailments. *Id.* She received a chest x-ray that revealed some soft tissue density in the right hilum, much like Lash, which the doctor attributed to a problem with her lymph nodes. *Id.* The diagnosis was an asthma attack. *Id.* at 739–40. The doctors listed the asthma diagnosis, filled out a treatment plan, and prescribed an anti-inflammatory drug. *Id.* at 740. The doctors even noted the possibility of a heart attack and advised her to

follow-up. *Id.* But the diagnosis was wrong; Pinkson died shortly after of a pulmonary embolism. *Id.* at 741. The state appellate court rejected Mabry's argument that the doctors mistreated Pinkson and, in doing so, determined that the hospital was immune under state law. The court noted the facts indicated some treatment of the symptoms, but that treatment solely related to the asthma diagnosis. *See id.* at 745. Overall, the doctors diagnosed "*only* asthma," and they "never considered a pulmonary embolism and never prescribed a course of treatment for a pulmonary embolism." *Id.* at 746. Thus, the plaintiff could never recover for any misdiagnosis of the heart condition. Our case is nearly indistinguishable: Glenn Lash arrived at a hospital with heart-attack symptoms; an x-ray was performed; he, too, had a history of risk factors; and the doctor made a misdiagnosis. Like in *Marby*, immunity bars any suit against the hospital.

Lash attempts to save this claim by arguing that Dr. Motwani, in his deposition, claimed that he diagnosed an "anxiety reaction" *and* "lymphadenopathy," the swelling of the lymph nodes. Thus, putting aside the anxiety reaction, the doctors and nurses were still negligent in treating the lymphadenopathy. Even accepting that an ex-post answer to deposition testimony adds an additional diagnosis, it still does not address the fact that the doctors and nurses failed to properly diagnose the acute cardiopulmonary disease that caused Glenn Lash's sudden death. *See Johnson*, 33 N.E.3d at 643 (concluding there was no liability where "[d]efendants treated plaintiff for her signs and symptoms but consistently diagnosed those signs and symptoms as muscle spasm and back/buttock contusion, not spinal cord injury"). And follow-up visit instructions, as given to the patient here, do not constitute "treatment." *See Mich. Ave.*, 732 N.E.2d at 532, 542 (determining that

"[t]here is no indication in the record that Dr. Ali rendered treatment to Collins in February 1987," even though Dr. Ali "recommended that Collins return to the hospital's Family Planning Clinic in three months and to the Gynecological Clinic in one year").

In short, Lash has not provided any evidence that a problem with the lymph nodes relates to the ultimately fatal heart condition. Thus, Sparta Hospital is immune under the Illinois Tort Immunity Act for the alleged negligent acts of its doctors and nurses.

**B. Informed Consent**

To prevail on an informed-consent complaint, the plaintiff must establish "(1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment [he] otherwise would not have consented to; and (4) plaintiff was injured by the proposed treatment." *Crim ex rel. Crim v. Dietrich*, 67 N.E.3d 433, 438–39 (Ill. App. Ct. 2016) (quoting *Davis v. Kraff*, 937 N.E.2d 306, 314–15 (Ill. App. Ct. 2010)). In essence, a plaintiff must "point to significant undisclosed information relating to the treatment which would have altered her decision to undergo it." *Coryell v. Smith*, 653 N.E.2d 1317, 1319 (Ill. App. Ct. 1995). The claim here fails for similar reasons as above. Glenn Lash never received any treatment and, thus, no doctor could have failed to disclose information that might have changed his decision. *See, e.g.*, *Davis*, 937 N.E.2d at 314 (plaintiff would have not undergone LASIK theory with better consent); *Coryell*, 653 N.E.2d at 1318 (no informed consent about the problems related to back surgery).

### III. Conclusion

For these reasons, we affirm the judgment of the district court.