SIXTH DIVISION
April 27, 2007

Nos. 1-05-3034 and 1-06-0726

| | | |
|---|---|---|
| NADINE WILLIS, Individually and as Independent | ) | Appeal from the |
| Administrator of the Estate of CLARENCE WILLIS, II, | ) | Circuit Court of |
| Deceased, | ) | Cook County. |
| | ) | |
|     Plaintiff-Appellant. | ) | No.  05 L 6198 |
| | ) | formerly 00 L 13221 |
| NANDINI KHATKHATE, M.D., REBECCA WILLIAMS, | ) | |
| M.D., LEO GERARDO, M.D., BARRY WENIG, M.D., | ) | Honorable |
| SUSAN SQUIRES, F.N.P., COUNTY OF COOK d/b/a | ) | Jeffrey Lawrence, |
| COOK COUNTY HOSPITAL, PETHAN | ) | Judge Presiding. |
| MUTHUSWAMY, M.D., and PRATIBA SANSI, M.D., | ) | |
| | ) | |
|     Defendants-Appellees. | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

In this medical malpractice case, plaintiff, Nadine Willis, individually and as independent administrator of the estate of Clarence Willis II, deceased, appeals the granting of summary judgment and dismissal in favor of defendants, Nandini Khatkhate, M.D., Rebecca Williams, M.D., Leo Gerardo, M.D., Barry Wenig, M.D. Susan Squires, F.N.P. (UIC defendants); Cook County Hospital, Petham Muthuswamy, M.D., and Pratiba Sansi (Cook County defendants).  We affirm in part, reverse in part, vacate in part and the cause is remanded for further proceedings.

During the summer of 1996, decedent went to the University of Illinois at Chicago Hospital (UIC) to be treated for a lump on his neck.  On or about June 17, 1996, decedent saw defendant nurse Susan Squires, who was supervised by the "physician of the day," defendant Dr. Nandini Khatkhate.  Nurse Squires worked in collaboration with the physician of the day and could handle most routine matters.  Nurse Squires reviewed the decedent's history, took her own

history, and performed a clinical exam. She then consulted with Dr. Khatkhate, they took blood for a number of lab tests and instructed the decedent to go for a chest X-ray and then come back in one week to discuss the findings. In one week they were going to send him to an ear, nose and throat (ENT) physician for an evaluation of his neck. The decedent arranged for the X-ray report to go to his private physician and did not return to UIC in one week as directed.

On July 25, 1996, decedent saw defendant nurse Squires at UIC, who set up an appointment with defendant Dr. Wenig, an ENT, for the following day. The decedent saw defendant Dr. Wenig on July 26, 1996. Dr. Wenig took decedent's history and then arrived at a differential diagnosis. Dr. Wenig ordered a fine needle aspiration and a CT scan of the head. Dr. Wenig called defendant Dr. Gerardo, a pathologist, to perform the fine needle aspiration. Drs. Wenig and Gerardo reviewed the slides of the material. Dr. Wenig dictated a letter to nurse Squires. Dr. Wenig referred the decedent back to the family practice clinic and never had contact with the decedent again. In fact, July 26, 1996, was the last day either Dr. Wenig or Dr. Gerardo had direct contact with the decedent. Dr. Gerardo dictated a written report with findings dated July 31, 1996. On that same date decedent went for a CT scan at UIC. On August 1, 1996, Dr. Wenig reviewed the films. Decedent did not return to UIC until September 16, 1996, when he again saw nurse Squires. Dr. Khatkhate was the physician of the day. After recording a history and performing a physical examination, nurse Squires reached a differential diagnosis of chronic lymphaditis on the right side of the neck, but she determined that he was to be managed for sarcoidosis. Multiple tests were ordered and nurse Squires consulted with Dr. Khatkhate. The decedent was instructed to return to UIC at least every six months as long as he stayed well, but

if there were any symptoms that developed, he was to contact the clinic earlier. The following day, September 17, 1996, nurse Squires discussed the decedent's lab results with Drs. Khatkhate and Wenig. Nurse Squires then called the decedent and told him to return in six weeks and to pick up an article on sarcoidosis.

At UIC, defendant Dr. Rebecca Williams treated the decedent for sarcoidosis on July 25 and October 3, 1996. Decedent complained of pain on the right side of his neck. Dr. Williams took a history, examined the decedent, and ordered tests. Decedent's sedimentation rate was more consistent with mild inflammation of sarcoidosis than with cancer. Dr. Williams gave the decedent a 30-day, nonrenewable course of low-dose steroids. The decedent returned on October 18, 1996, and was seen by nurse Squires, who determined that he was responding well to the steroids because the mass was smaller and less tender than before. Nurse Squires told the decedent to follow up on a regular basis. The decedent never saw nurse Squires again but called her on November 7, 1996, stating that he had a cold, and nurse Squires called the decedent on November 11, 1996, to tell him about a sarcoidosis support group. That was the last contact she had with the decedent.

Between July 31, 1996, and December 1997 the decedent received treatment at Cook County Hospital for sarcoidosis under the care of Cook County Hospital defendants Dr. Muthuswamy and Dr. Sansi. On January 16, 1997, the decedent went to the Pulmonary Medicine Clinic at Fantus Health Service at Cook County Hospital to obtain additional information about sarcoidosis. Defendant Dr. Muthuswamy reviewed the decedent's 1996 diagnosis of sarcoidosis and node biopsy and chest X-ray results and concluded that the decedent

suffered from sarcoidosis. Dr. Muthuswamy ordered a serum angiotensin converting enzyme test, a chest X-ray, and the decedent's medical records. The decedent returned to Cook County Hospital on March 27, 1997, and had an X-ray. The decedent was seen at Cook County Hospital on April 3, 1997, July 3, 1997, October 30, 1997, and December 18, 1997. In December 1997, decedent gained weight, had a spiked temperature, complained of a sore throat, joint and muscle pain and cramps. He was sent to the emergency room at the University of Chicago.

On January 8, 1998, 15 months after his last visit to UIC, the decedent went to the UIC emergency room, where he was diagnosed with sarcoidosis and hepatitis. The next day, the decedent went to UIC complaining of right upper quadrant pain, night sweats, decreased energy levels and weight loss. He asked for Dr. Williams because nurse Squires had retired. Dr. Williams recognized a dramatic change in the decedent's condition from the last time she had seen him 15 months earlier and believed he may be suffering from another illness in addition to sarcoidosis. Dr. Williams immediately referred the decedent to a pulmonologist and was concerned that the decedent might have lymphoma or tuberculosis, so she also referred the decedent to a surgeon for a biopsy. On January 21, 1998, Dr. Williams arranged for the decedent to have the biopsy with Dr. Resnick on January 30, 1998. On January 22, 1998, the decedent came into UIC with a cough, high fever, and swelling in his legs. Dr. Resnik admitted the decedent into UIC Hospital. Dr. Khatkhate was assigned to care for the decedent for three days leading up to the biopsy, which occurred on the scheduled date, January 30, 1998. The biopsy led to a diagnosis of Hodgkins lymphoma and was confirmed by a liver biopsy on February 12, 1998. In January 1998 Dr. Khatkhate and Dr. Williams were directly involved in the

care of the decedent. Dr. Williams rendered her last treatment of the decedent for sarcoidosis on January 25, 1998.      On January 22, 1998, the decedent was seen by Dr. Khatkhate complaining of persistent pain and painful lumps in his neck. Decedent was referred to Dr. Resnick for a lymph node biopsy to rule out lymphoma, but on January 30, 1998, Dr. Resnick determined that Hodgkin's lymphoma was the primary cause of the decedent's suffering.

The decedent sought treatment for Hodgkin's lymphoma from January 30, 1998, until his death on November 15, 1999. On November 14, 2000, the decedent's mother, Nadine Willis, individually and as independent administrator of the estate of the decedent, filed her original complaint alleging the acts of Dr. Khatkhate, Dr. Williams, Dr. Gerardo, Dr. Wenig, and nurse Squires of UIC and Dr. Muthuswamy and Dr. Sansi of Cook County Hospital caused the injuries and wrongful death of the decedent.

Plaintiff filed her original complaint against all defendants on November 14, 2000, and subsequently filed an amended complaint. The UIC defendants filed a motion for summary judgment alleging that the statute of repose barred the plaintiff's claims. 735 5/13-212(a) (West 2000). On July 18, 2005, the circuit court granted summary judgment in UIC's favor. Plaintiff filed a motion for reconsideration concerning Drs. Khatkatke and Williams only. The circuit court denied the plaintiff's motion to reconsider. This timely appeal followed regarding these orders. The Cook County defendants, Drs. Muthuswamy and Sansi, filed a motion for summary judgment based on the applicable statute of limitations and the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2000)). On August 19, 2005, the circuit court granted summary judgment in the Cook

County defendants' favor as to the statute of limitations but denied summary judgment as to tort immunity. Plaintiff appealed this order. On September 15, 2005, plaintiff filed a second amended complaint alleging causes of action against all UIC defendants. On March 9, 2006, the circuit court granted the UIC defendants' motion to dismiss. Plaintiff filed a second notice of appeal. The appeals were consolidated.

On appeal, plaintiff contends that the circuit court erred by granting summary judgment in favor of Drs. Khatkhate and Williams because their negligent misdiagnoses of decedent occurred within four years of the original complaint being filed, that is, within the statute of repose. 735 ILCS 5/13-212 (West 2000).

Summary judgment is properly granted where the pleadings, depositions, affidavits, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Mabie v. Village of Schaumburg, 364 Ill. App. 3d 756, 758 (2006). We review the trial court's granting of summary judgment *de novo*. Arangold Corp. v. Zehnder, 204 Ill. 2d 142, 146 (2003).

Under section 13-212 of the Illinois Code of Civil Procedure, "no action for medical malpractice shall be brought more than 4 years after the date on which the act or omission or occurrence alleged in such action to have been the cause of such injury." 735 ILCS 5/13-212 (West 2000). However, the statute of repose can begin to toll at a later date than on the date stated above if there was an ongoing course of negligent medical treatment. Cunningham v. Huffman, 154 Ill. 2d 398, 405 (1993). To prevail on such a basis, the plaintiff must demonstrate:

6

(1) that there was a continuous and unbroken course of negligent treatment; and (2) that treatment was so related and continuous as to constitute one continuous wrong. Cunningham, 154 Ill. 2d at 406.

Plaintiff alleges that Dr. Williams continued to treat the decedent on January 9, 1998, at the UIC hospital for sarcoidosis and not Hodgkin's lymphoma. Plaintiff supports this allegation with Dr. Williams' deposition testimony in which the following colloquy occurred.

"QUESTION: Because you were considering that he might have lymphoma, why is it you do not refer him to surgery on January 9, 1998?

ANSWER: There was still that lingering question about whether or not the sarcoid could explain all of this. I did speak to other physicians in the practice and there was some question about whether or not it might all be due to sarcoid."

Plaintiff also alleges that Dr. Khatkhate treated the decedent January 22 through 25, 1998, at the UIC Hospital for sarcoidosis. She supports this allegation with Dr. Khatkhate's deposition testimony that she was the attending physician when the decedent was an inpatient at UIC Hospital on January 22 through 25, 1998, and on those dates her "working diagnosis was sarcoidosis." Dr. Khatkhate also read her treatment notes of the decedent from those dates during the deposition into the record.

UIC defendants note that Dr. Williams referred the decedent for a biopsy and Dr. Khatkhate did not delay the biopsy. Further, decedent went to Cook County Hospital for treatment in 1997, perhaps breaking the course of continuing treatment. However, the decedent

did return to Drs. Williams and Khatkhate in 1998 and remained in the UIC health system as a student. Considering all of the pleadings and attached documents in a light most favorable to the plaintiff, we believe there are genuine issues of material fact precluding summary judgment as to these two defendants regarding whether their treatment was continuous and whether it was negligent.

The UIC defendants cite <u>Flynn v. Szwed</u>, 224 Ill. App. 3d 107 (1991), to support their argument that there was not a continuing course of negligent treatment because there was a lengthy gap in treatment and the decedent sought treatment from other doctors. However, in <u>Flynn</u>, not only was there a lengthy gap in treatment but the plaintiff sought treatment for different complaints. <u>Flynn</u>, 224 Ill. App. 3d at 115. Here the complaint was the same. Therefore, <u>Flynn</u> is distinguishable from the case at bar.

Next, plaintiff contends that the circuit court erred by dismissing her complaint and by granting summary judgment in favor of defendants Dr. Gerardo, Dr. Wenig, and nurse Squires. Plaintiff asserts that the statute of repose did not start running on the last day that these defendants treated the decedent but offers alternative dates and theories.

Concerning Drs. Gerardo and Wenig, plaintiff asserts that, although they last saw the decedent in 1996, there was ongoing treatment of the decedent because their misdiagnoses of sarcoidosis in 1996 were relied on by other doctors until the correct diagnosis of Hodgkins lymphoma was made in January 1998. Therefore, plaintiff argues, the statute of repose began to run in January 1998.

Similarly, concerning nurse Squires, plaintiff asserts that, although she last saw decedent in 1996, there was ongoing treatment because Squires' notes may have been relied on by others in their treatment of the decedent, thus delaying the correct diagnosis.

Plaintiff cites no case on point to make these novel arguments but relies only on Cunningham v. Huffman, 154 Ill. 2d 398, 405 (1993), for support. We are baffled by this reliance. In Cunningham, the Illinois Supreme Court clearly states that "once treatment by the negligent physician is discontinued, the statute of repose begins to run, regardless of whether or not the patient is aware of the negligence at termination of treatment." Cunningham, 154 Ill. 2d at 406. We read nothing in Cunningham to suggest that the statute of repose can begin to run past the time of the last treatment as the plaintiff posits here. Therefore, there are no genuine issues of material fact regarding these issues and the circuit court properly granted summary judgment in favor of Drs. Gerardo and Wenig and nurse Squires and properly dismissed the cause of action as to these defendants.

Next, plaintiff argues that the trial court erred by granting Cook County defendants Drs. Muthswamy and Sansi summary judgment based on the statute of limitations. 745 ILCS 10/8-101 (West 1998). However, the Cook County defendants urge us to affirm on the basis that they are immune from liability under sections 6-105 and 6-106(a) of the Tort Immunity Act. 745 ILCS 10/6-105, 106(a) (West 1998). Because we believe the Cook County defendants are immune from liability and this issue renders the statute of limitations issue moot, we shall only discuss immunity.

9

In construing a statute we must ascertain and give effect to the legislature's intent. In re Donald A.G., 221 Ill. 2d 234, 246 (2006). The best indication of the legislature's intent is the plain and ordinary language of the statute. Donald A.G., 221 Ill. 2d at 246. We interpret the language of a statute *de novo*. Donald A.G., 221 Ill. 2d at 246.

Section 6-105 grants immunity upon public officials who have failed to make a physical or mental examination or have failed to make an adequate physical or mental examination. 745 ILCS 10/6-105 (West 1996); Michigan Avenue National Bank v. County of Cook, 191 Ill. 2d 493, 504 (2000). Section 6-106(a) grants immunity upon public officials who have (1) diagnosed a person with a mental or physical illness; (2) failed to make a diagnosis that a person is afflicted with a mental or physical illness or addiction; and (3) failed to prescribe for a mental illness or addiction. 745 ILCS 10/6-106(a) (West 1996); Michigan Avenue National Bank, 191 Ill. 2d at 510. Because the Tort Immunity Act is in derogation of common law, it must be strictly construed against the County. See Antonacci v. City of Chicago, 335 Ill. App. 3d 22, 27 (2002).

The Illinois Supreme Court addressed this issue in Michigan Avenue, where it held that where a plaintiff alleges that a public entity fails to diagnose an illness (breast cancer), it is immune under section 106(a) of the Tort Immunity Act. Michigan Avenue, 191 Ill. 2d at 514. In Michigan Avenue the decedent visited the defendant hospital numerous times complaining of a lump and sometimes pain in her left breast. Michigan Avenue, 191 Ill. 2d at 496-99. The defendant doctors told her she had fibrocystic, or dense, breast disease and performed no tests to determine whether it was cancer and did not treat her condition. Michigan Avenue, 191 Ill. 2d at 496-99. The supreme court held that the defendant hospital was immune from liability because

the gravamen of the plaintiff's complaint was a failure to diagnose. <u>Michigan Avenue</u>, 191 Ill. 2d at 514.

The supreme court stated that the word "diagnosis" is not ambiguous and, thus, must be given its plain and ordinary meaning. <u>Michigan Avenue</u>, 191 Ill. 2d at 510. "Webster's dictionary defines 'diagnosis' as the 'art or act of identifying a disease from its signs and symptoms,' and as an 'investigation or analysis of the cause or nature of a condition, situation, or problem.' Webster's Third New International Dictionary 622 (1993). The Sloan-Dorland Annotated Medical-Legal Dictionary defines 'diagnosis' as 'the art of distinguishing *** the nature of a cause of disease.' Sloan-Dorland Annotated Medical-Legal Dictionary 199 (1987). See also Attorney's Dictionary of Medicine D-102 (1999) ('diagnosis' is defined as '[t]he determination of what kind of disease a patient is suffering from, especially the art of distinguishing between several possibilities'); Black's Law Dictionary 464 (7th ed. 1999) (defining 'diagnosis' as '[t]he determination of a medical condition (such as disease) by physical examination or by study of its symptoms'); Stedman's Medical Dictionary 428 (25th ed. 1990) (denoting 'diagnosis' as '[t]he determination of the nature of a disease')." <u>Michigan Avenue</u>, 191 Ill. 2d at 510-11.

Plaintiff correctly notes that, although subsection 6-106(a) grants immunity for diagnosing, failing to diagnose, and failing to prescribe, (745 ILCS 10/6-106(a) (West 1998)), the remaining sections of section 6-106 contain limitations on immunity where it is alleged that a local public entity and its public employees have caused a person to suffer injury due to the negligent prescription of treatment and/or the negligent administration of treatment. See 745

No. 1-05-3034 and 1-06-0726

ILCS 10/6-106(b),(c),(d) (West 1998). "'[T]reatment' is defined in Webster's Dictionary as 'the action or manner of treating a patient medically or surgically.' Webster's Third New International Dictionary 2435 (1993). The Medical Dictionary for Lawyers defines 'treatment' as '[t]he care of a sick person, and the remedies or means employed to combat the disease affecting him.' B. Maloy, Medical Dictionary for Lawyers 681 (3d ed. 1960). 'Treatment' is denoted in Sloan-Dorland's Annotated Medical-Legal Dictionary 746 (1987) as '[t]he management and care of a patient for the purpose of combating disease or disorder.' See also Stedman's Medical Dictionary 1626 (25th ed. 1990) (defining 'treatment' as '[t]he medical or surgical management of a patient')." Michigan Avenue, 191 Ill. 2d at 511-12.

Plaintiff contends that the allegations in her complaint and the evidence contained in the supporting documents establish that Dr. Muthswamy made a differential diagnosis of decedent's Hodgkin's lymphoma and then he failed to properly treat the differential diagnosis of Hodgkin's lymphoma. Plaintiff contends that this establishes a negligent treatment scenario, which is not immunized as stated under subsections 6-106(b), (c), and (d) of the Tort Immunity Act. 745 ILCS 10/6-106(b), (c), (d) (West 1998).

After reviewing plaintiff's complaint and supporting evidence and documents, we believe plaintiff essentially alleges a failure to diagnose Hodgkins lymphoma and, thus, Cook County defendant Dr. Muthswamy is immune under section 6-106(a) of the Tort Immunity Act. 745 ILCS 10/6-106(a) (West 1998). Plaintiff's contention that this is a "failure to properly treat" case is belied by two of the five allegations in the complaint which specifically relate to diagnostic actions. Plaintiff alleges that Dr. Muthswamy "[failed] to properly or adequately perform follow

12

up tests or treat the abnormal pathology report conditions made during Plaintiff's Decedent's treatment," and "[failed] to obtain adequate or proper consults with specialists." It is also of note that plaintiff later alleges "that prior to his death, Plaintiff's decedent did not know and reasonably could not know that defendants were negligent in *failing to diagnose his Hodgkin's Lymphoma* sooner than they did." Although the other three allegations state that Dr. Muthswamy "[failed] to properly treat Plaintiff's decedent's condition[, failed] to properly treat Plaintiff's decedent's Hodgkin's Lymphomia [*sic*] [or was] otherwise negligent in [his] care of Plaintiff's decedent," we conclude that the supporting documents do not support plaintiff's assertions that this cause of action is premised on a failure to properly treat the decedent's Hodgkin's lymphoma. Rather, we believe it is premised on a failure to diagnose the decedent's Hodgkin's lymphoma.

For example, in her response to Cook County's motion for summary judgment, plaintiff contends that Dr. Muthswamy made a differential diagnosis of Hodgkin's lymphoma and Dr. Muthswamy's deposition indeed supports this contention. A differential diagnosis that is not chosen and/or treated as the ultimate diagnosis is a misdiagnosis by definition. "Differential diagnosis" is defined as the "determination of which one of two or more diseases with similar symptoms is the one the patient is suffering." The American Heritage Stedman's Medical Dictionary 229 (1995). It is also defined as "the distinguishing of a disease or condition from others presenting similar symptoms" (Webster's Third New International Dictionary 630 (1993)), and "[t]he methods of distinguishing between two or more diseases having similar symptoms by carefully comparing and evaluating the few dissimilar characteristics and signs, and thus making

13

a final diagnosis." (Schmidt, Attorney's Dictionary of Medicine D-126, (2007)). The evidence in this case establishes that Dr. Muthswamy considered Hodgkin's lymphoma (differential diagnosis) but actually diagnosed the decedent with sarcoidosis and treated him for sarcoidosis. Further, nothing in the record indicates that Dr. Muthswamy treated the decedent for Hodgkin's lymphoma. A failure to prescribe treatment is immunized under section 6-106(a) of the Tort Immunity Act. 745 ILCS 6-106(a) (West 1998).

The failure of Dr. Muthswamy to actually treat the decedent for Hodgkin's lymphoma distinguishes this case from Mills v. County of Cook, 338 Ill. App. 3d 219 (2003), cited by plaintiff, in which the appellate court held that where a plaintiff alleges that an employee working for a public entity correctly examines and correctly diagnoses a patient but negligently treats him, causing injury, the public entity is not immune under sections 6-105 and 6-106(a) of the Tort Immunity Act. Mills, 338 Ill. App. 3d at 223-24. In Mills, the defendant physician diagnosed the deceased infant with an upper respiratory infection and also made a differential diagnosis of pneumonia. Mills, 338 Ill. App. 3d at 220. The defendant physician ordered tests, treated the infant and sent him home with medicine. Mills, 338 Ill. App. 3d at 220-21. The infant died a few hours after discharge. Mills, 338 Ill. App. 3d at 221. An expert physician testified during a deposition that the failure on the part of the defendant physician to fully treat the infant's pneumonia proximately caused the infant's death. Mills, 338 Ill. App. 3d at 221. In holding that sections 6-105 and 6-106(a) were inapplicable, the court the defendant physician "correctly examined and diagnosed her [patient's] condition." Mills, 338 Ill. App. 3d at 223. The court

14

also noted that "[t]reatment was rendered pursuant to the differential diagnosis." Mills, 338 Ill. App. 3d at 223.

In this case, nothing in the record indicates that treatment was rendered pursuant to the differential diagnosis. Like Collins in the Michigan Avenue case, the negligence in this case is not based on the treatment the decedent received, but on the treatment the decedent should have received and the diagnosis Dr. Muthswamy should have made. The gravamen of plaintiff's suit is a failure to properly diagnosis the decedent with Hodgkin's lymphoma. See Michigan Avenue, 191 Ill. 2d at 512; Mabry v. County of Cook, 315 Ill. App. 3d 42, 53 (2000).

Thus, contrary to plaintiff's assertion, Mills is not controlling here. Accordingly, Cook County defendant Dr. Muthswamy is immune from liability under section 6-106(a) of the Tort Immunity Act (745 ILCS 10/6-106(a) (West 2000)), and we affirm the trial court dismissal on this basis. See 735 ILCS 5/2-619(d), (e) (West 2000).

Similarly, regarding Dr. Sansi, the complaint contains the same allegations. Further, plaintiff attached a physician's report, pursuant to section 2-622(a)(1) of the Code of Civil Procedure (735 ILCCS 5/2-622(a)(1) (West 1998)) regarding Dr. Sansi stating the following in part: "Dr. Sansi failed to properly communicate the significance of the findings [of the gallium scan] to Mr. Willis' treating physician. The findings as reported were compatible with lymphoma. The failure on the part of Dr. Sansi to communicate the significance of all the findings to a treating physician was negligent and likely contributed to a delay in instituting proper treatment to Clarence Willis. Further, this delay caused or contributed to damages and ultimately the death of Clarence Willis."

Dr. Sansi performed a gallium test scan on the decedent to determine whether there was lung involvement. Her deposition testimony revealed that she did not make a differential diagnosis because she believed that the decedent had already been diagnosed with sarcoidosis.

In viewing the pleading and attached documents in a light most favorable to the plaintiff, we do not believe that they allege that Dr. Sansi diagnosed and treated the decedent negligently; rather, they essentially claim that Dr. Sansi failed to communicate to Dr. Muthswamy the results of the gallium test scan which led to a delay in the correct diagnosis of lymphoma. In other words, the plaintiff alleges that Dr. Sansi contributed to the misdiagnosis of the decedent. This is alleged conduct which is immunized under sections 6-105 and 6-106(a) of the Tort immunity Act. See Michigan Avenue, 191 Ill. 2d at 514. Accordingly, we affirm that part of the trial court's decision dismissing Dr. Sansi as a defendant.

Lastly, plaintiff contends that the trial court erred by granting the UIC defendant's motion to dismiss plaintiff's second amended complaint with prejudice. A section 2-619 (735 ILCS 5/2-619 (West 2000)) motion for involuntary dismissal based on certain defects or defenses admits the legal sufficiency of the complaint, along with all well-pleaded facts and the inferences therefrom, but asserts an affirmative matter that avoids or defeats the claim. Larochelle v. Allamian, 361 Ill. App. 3d 217, 219 (2005). We review a circuit court's decision to dismiss a case de novo. Oliveira v. Amoco Oil Co., 201 Ill. 2d 134, 147-48 (2002).

Because we have already decided that the trial court erred by granting the UIC defendants' motion for summary judgment regarding Drs. Khatkhate and Williams, we vacate the trial court's granting of the motion to dismiss plaintiff's second amended complaint as to these

defendants. However, the new allegations contained in the second amended complaint are conclusory and, without support, cannot toll of the statute of repose. Therefore, the trial court properly granted UIC defendants' motion to dismiss as to defendants, Dr. Gerardo, Dr. Wenig, and nurse Squires.

In conclusion, we affirm summary judgment and dismissal of UIC defendants Drs. Gerardo and Wenig and nurse Squires regarding the statute of repose (735 ILCS 5/13-212 (West 2000)); and affirm dismissal of Dr. Muthswamy and Dr. Sansi based on the Tort Immunity Act (745 ILCS 10/6-105, 6-106(a) (West 2000)). We reverse summary judgment in favor of UIC defendants Drs. Khatkhate and Williams regarding the statute of repose (735 ILCS 5/13-212 (West 2000)). We vacate dismissal of plaintiff's second amended complaint. The remaining defendants are UIC's Drs. Khatkhate and Williams.

Affirmed in part, reversed in part and, vacated in part, cause remanded for further proceedings.

JOSEPH GORDON and O'MALLEY, JJ., concur.

17