# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Hanks v. Cotler*, 2011 IL App (1st) 101088

---

| | |
|---|---|
| Appellate Court Caption | PHILLIPS HANKS, Individually and as Next Friend of Cammeren Tyler Hanks, Collier Phillip Hanks, and Christian Nathaniel Hanks, Minors, Plaintiffs-Appellants, v. SCOTT COTLER, Individually and as Agent of Rush University Medical Center; SYED ZAIDI, Individually and as Agent of Rush University Medical Center; RUSH UNIVERSITY MEDICAL CENTER; HUGH M. O'NEILL, Individually and a Agent of Family Practice Health Care; AJAY BAJAJ, Individually and as Agent of Midwest Gastroenterology Associates, Ltd.; THOMAS J. LAYDEN; THELMA WILEY-LUCAS, Individually and as Agent of Rush University Medical Center; and ALLYSON HANKS, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-1088 |
| Filed | September 29, 2011 |
| Rehearing denied | October 11, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Multiple counts of a refiled and amended complaint for medical negligence in the treatment and diagnosis of plaintiff's condition arising from tests indicating a possible diagnosis of hepatitis C were properly dismissed as untimely under the two-year statute of limitations and the four-year statute of repose applicable to medical malpractice actions, and the counts alleging plaintiff's children's loss of society due to his injuries were properly dismissed on the ground that Illinois law does not recognize a cause of action for a child's loss of a parent's society due to a nonfatal injury. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-9056; the Hon. Thomas P. Quinn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Robert A. Holstein, of Holstein Law Offices, LLC, of Chicago, for appellants. |
| | Scott L. Howie, Migeul A. Ruiz, and Suzanne M. Crowley, all of Pretzel & Stouffer Chtrd., of Chicago, for appellees Family Practice Health Care P.C. and Hugh M. O'Neill. |
| | Sherry A. Mundorff and Laura J. Young, both of Kominiarek Bresler Harvick & Gunmundson LLC, of Chicago, for appellees Thomas J. Layden and Thelma Wiley-Lucas. |
| | Jennifer L. Medenwald and Roger Littman, both of Querrey & Harrow, Ltd., of Chicago, for appellees Ajay Bajaj and Midwest Gastroenterology Associates, Ltd. |
| Panel | PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion. Justices Pucinski and Sterba concurred in the judgment and opinion. |

**OPINION**

¶ 1 Phillip Hanks, the appellant, sought medical treatment for various physical symptoms in 2002. Early test results suggested the possible diagnosis of hepatitis C. His care providers performed, among other procedures, an endoscopic diagnostic procedure called an ERCP (endoscopic retrograde cholangiopancreatography), which was designed to aid doctors in determining the cause of the patient's complaints. That procedure was, to say the least, complicated, resulting in various medical problems and causing Hanks to file a complaint in 2003 against defendants Dr. Scott Cotler, Dr. Syed Zaidi, and Rush Medical Center (Rush), alleging medical negligence. This complaint was voluntarily dismissed in 2008 and refiled later that same year. The refiled complaint added various additional health care providers as defendants, including Dr. Hugh M. O'Neill, Dr. Ajay Bajaj, Dr. Thomas J.

Layden, Dr. Thelma Wiley-Lucas, Midwest Gastroenterology Associates, Ltd., and Family Practice Health Care. Remarkably enough, appellant at that time also added his ex-wife as a defendant, claiming, *inter alia*, that she had previously failed to cooperate in the malpractice litigation and had, therefore, abandoned any "interest" in the litigation. The twice-amended complaint contained 24 counts.[1] Defendant moved to dismiss various counts of the second amended complaint, with the circuit court eventually dismissing counts III through VII, IX, and XII through XXI, for various reasons, chief among them being that the malpractice lawsuit was time-barred by the relevant statute of limitations and not saved by the relevant statute of repose. On appeal, Hanks contends that the trial court's rulings dismissing those counts for being time-barred were in error and that the trial court improperly refused to recognize a cause of action for his children's loss of society, which presumably would not be time-barred because of their minority. We affirm the trial court in all respects.

¶ 2                                    I. BACKGROUND

¶ 3                                  A. Factual Background

¶ 4        The following facts were derived from Hanks' second amended complaint. In February 2002, Hanks was advised by his primary care physician, Hugh M. O'Neill M.D., that Hanks' blood test results indicated the possible diagnosis of hepatitis C. Hanks was referred to Dr. Ajay Bajaj for further examination, but that doctor was "booked" for the following two months. Because of this, Hanks instead visited a hepatologist, Dr. Talal Sunbulli at Little Company of Mary Hospital, who ordered a "hepatic profile," which examines liver enzymes in an individual's blood. Based on the hepatic profile, Dr. Sunbulli ordered a liver biopsy, which was performed on March 29, 2002. The biopsy indicated that Hanks' hepatitis C infection was so slight as to be classified at the "minimal gradation of grade I, stage 0."

¶ 5        Shortly after this biopsy, Hanks again consulted with Dr. Sunbulli because he began to experience jaundice and itching. Dr. Sunbulli ordered a liver ultrasound to be conducted, but its results did not indicate any duct blockage or other obstructive process that would normally cause Hanks' complaints. Hanks was subsequently advised that his jaundice would resolve over time. Hanks then returned to Dr. O'Neill on April 16, 2002, and reported the medical events between their two visits. For some reason, Dr. O'Neill allegedly contacted Dr. Bajaj instead of Dr. Sunbulli and scheduled an April 19, 2002, appointment on Hanks' behalf for the purpose of further exploring his symptoms. During that appointment, Dr. Bajaj referred Hanks to Rush, assuming he was specifically referring Hanks to Dr. Donald Jensen, a nationally renowned liver specialist, but it developed that Jensen had left Rush for a position at the University of Chicago. Hanks was instead seen at Rush by Dr. Scott Cotler, whom he

---

[1]Counts I through VII and IX alleged medical negligence amongst the various defendants, VIII alleged institutional negligence against Rush, X through XV advanced various theories of vicarious liability, XVI advanced a conspiracy amongst various defendants, XVII through XIV contained allegations of fraud, XX and XXI alleged loss of consortium and society on behalf of Hanks' children, XXII challenged Hanks' marital settlement agreement as to Allyson Hanks, and XXIII and XXIV raised certain discovery issues.

claimed was "much less experienced."

¶ 6    Hanks met with and was examined by Dr. Cotler. It was alleged that Cotler did not consult with Sunbulli and advised Hanks to undergo the aforementioned ERCP to help evaluate the potential role of his biliary system in causing his complaints. The ERCP was scheduled to be performed on that day. Dr. Syed Zaidi performed the ERCP, which had to be aborted because Hanks unexpectedly awoke during the procedure while a scope was still in his abdomen. Hanks was hospitalized at Rush following the aborted ERCP, where he experienced nausea, fever, pain in his lower abdominal area, and significant weight loss. He was diagnosed as having ERCP-induced pancreatitis, a medical condition in which the pancreas is acutely inflamed as a result of the trauma caused by the instrumentation involved in the procedure.

¶ 7    Hanks returned to Dr. Bajaj around September 4, 2002, to complete the previously aborted ERCP. The procedure was apparently performed appropriately and no biliary duct obstruction was discovered. Another liver biopsy, however, was recommended and completed on November 5, 2002. It is after completion of the liver biopsy that Hanks alleges his medical providers began actively steering him in the wrong medical direction. Specifically, he alleged that Drs. Bajaj, O'Neill, and Cotler conferred with each other and agreed that Hanks' hepatitis C infection had advanced at a rapid rate and could have by then invaded his liver cells. Hanks later met with Dr. Bajaj, who told Hanks that his hepatitis C had not advanced significantly since March 2002, and continued to treat and prescribe medication for Hanks in relation to his jaundice, itching, diarrhea, pancreatitis and stage I hepatitis.

¶ 8    Dr. O'Neill later spoke with Cotler regarding Hanks' recent liver biopsy. Cotler stated that he was acquainted with Dr. Thelma Wiley-Lucas, a doctor at the University of Illinois at Chicago Medical Center (UIMC) that worked with Dr. Thomas J. Layden almost exclusively on hepatitis C patients. Cotler related that he would ask Dr. Wiley-Lucas to create a workup of Hanks for possible liver cancer. Cotler was alleged to have told O'Neill that Wiley-Lucas was aware of the aborted ERCP and "was confident that she would not tell [Hanks] anything about his current condition as being related if she were to order a workup." O'Neill subsequently called Wiley-Lucas and arranged for her to see Hanks on December 9, 2002. Wiley-Lucas informed O'Neill at that time that she was winding down her employment with UIMC and would be moving to Rush and would not be able to treat Hanks after performing a workup on him. In a meeting with Hanks around November 20, 2002, O'Neill allegedly said that the referral to Wiley-Lucas was prompted by the failure to find any causes to Hanks' persistent jaundice, diarrhea, and other related ailments.

¶ 9    On December 9, 2002, Hanks was seen by Wiley-Lucas. A letter by Wiley-Lucas indicated she was aware of the March 2002 liver biopsy indicating Hanks' hepatitis C infection to be at an extremely low level, as well as the subsequent CT and ultrasound scans that were conducted to determine whether any blockages existed that might have been causing Hanks' jaundice. Hanks' complaint was openly critical of the fact that the letter apparently did not mention the aborted ERCP or any consequences related to it. Another liver biopsy was performed on Hanks' liver on December 11, 2002. The biopsy, dated December 17, 2002, indicated that Hanks' hepatitis C was at stage III, with fibrosis (a precancerous

condition) being present. Wiley-Lucas performed an abdominal CT scan, which showed a mass formation in Hanks' liver.

¶ 10    When Wiley-Lucas departed from UIMC, Hanks' treatment was continued by Dr. Layden at UIMC. However, Hanks alleges none of the medical professionals at UIMC was made aware of the December 2002 scans and test results until nearly a year later. In spring of 2004, Hanks returned to Wiley-Lucas for treatment at Rush and she was said to have no recollection of previously meeting or treating Hanks. Hanks also alleges that while Wiley-Lucas acquired portions of his medical history, she failed to acquire records of her treatment of him while at UIMC and thus failed to advise him that he had stage III hepatitis C, fibrosis, and a growth on his liver. On August 10, 2005, Hanks and Wiley-Lucas met at Rush, where Hanks asked whether she believed his hepatitis C had become worse. He also explained that none of his medications seemed to have any effect on his tiredness. Wiley-Lucas allegedly said the fatigue was due to subsiding pancreatitis and that Hanks had cirrhosis of the liver.

¶ 11    Hanks was diagnosed on August 29, 2006 with liver cancer, ultimately receiving a liver transplant about 14 months later. Hanks' second amended complaint also recounts his numerous hospitalizations for his various maladies throughout the years, including diabetes, acute and chronic pancreatitis, and liver cancer. He attributes all of his aggravated medical problems to the aborted ERCP in April 2002.

¶ 12                              B. Procedural Background

¶ 13    Hanks initially filed a lawsuit pertaining to the underlying facts on March 20, 2003, naming Dr. Zaidi, Dr. Cotler, and Rush as defendants. Hanks' 2003 complaint contained several counts, including various allegations of medical negligence resulting in personal injury and loss of consortium. The medical negligence counts against Cotler alleged that he failed to properly examine Hanks or advise him as to the risks associated with an ERCP. It was also alleged that Cotler deviated from the applicable standard of care by failing to monitor Hanks' condition after the aborted ERCP. The allegations against Zaidi were fairly similar, with the additional allegation that he attempted the ERCP without properly ascertaining whether Hanks was properly sedated, all of which "induced pancreatitis to set in aggravating [Hanks'] existing medical condition."

¶ 14    Discovery commenced and progressed up to the taking of depositions of Hanks' treating physicians, but on April 22, 2008, Hanks voluntarily dismissed his complaint. Several months later, Hanks refiled his complaint, which revolved around the same treatment but which contained new defendants and new theories of liability. Defendants moved to dismiss the complaint but Hanks, in response, requested and was granted leave to amend the complaint. Hanks' first amended complaint was eventually dismissed but he was granted leave to file a second amended complaint, which Hanks did on October 23, 2009. The second amended complaint, which is at issue on appeal, contained 24 counts alleging various theories of liability amongst the numerous defendants. Defendants again moved to dismiss the second amended complaint under sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2008)). Ultimately, the circuit court denied motions to dismiss certain counts relating to the 2003 defendants (Dr. Cotler, Dr. Zaidi, and

Rush) but dismissed counts III through VII, IX, and XII through XXI. Hanks now appeals.

¶ 15                                    II. ANALYSIS

¶ 16                              A. Time-Barred Counts

¶ 17      Hanks first contends that the circuit court erred in dismissing various counts in his second amended complaint as being time-barred. A motion to dismiss pursuant to section 2-615 or section 2-619 of the Code (735 ILCS 5/2-615, 2-619 (West 2008)) admits as true all well-pleaded facts, as well as reasonable inferences to be drawn therefrom. *Purmal v. Robert N. Wadington & Associates*, 354 Ill. App. 3d 715, 720 (2004). However, "conclusions of law and conclusory factual allegations not supported by allegations of specific facts are not deemed admitted." *Id.* Furthermore, Illinois is a fact-pleading jurisdiction that requires a plaintiff to present a legally and factually sufficient complaint and a plaintiff must allege sufficient facts to state all the elements of the asserted cause of action. *Id.* A motion to dismiss under section 2-615 of the Code attacks the legal sufficiency of a complaint, and only attacks the face of the complaint. *Board of Directors of Bloomfield Club Recreation Ass'n v. The Hoffman Group, Inc.*, 186 Ill. 2d 419, 423 (1999). A motion to dismiss under 2-619 of the Code, on the other hand, admits the legal sufficiency of well-pleaded factual allegations but raises defects or defenses that act to defeat the claims. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006). This court reviews *de novo* orders dismissing causes of actions as time-barred under section 2-619(a)(5) of the Code (735 ILCS 5/2-619(a)(5) (West 2008)). *Peregrine Financial Group, Inc. v. Futronix Trading, Ltd.*, 401 Ill. App. 3d 659, 660 (2010).

¶ 18      In the case *sub judice*, two legal impediments were raised to defeat the relevant counts in Hanks' second amended complaint: the statute of limitations and the statute of repose. Each is outlined in section 13-212(a) of the Code, which provides:

> "Except as provided in Section 13-215 of this Act, no action for damages for injury or death against any physician, dentist, registered nurse or hospital duly licensed under the laws of this State, whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought more than 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, or received notice in writing of the existence of the injury or death for which damages are sought in the action, whichever of such date occurs first, but in no event shall such action be brought more than 4 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death." 735 ILCS 5/13-212(a) (West 2008).

Accordingly, section 13-212(a) contains a two-year statute of limitations and a four-year statute of repose that impose time limits on when a plaintiff can timely file a cause of action for professional medical negligence. *Follis v. Watkins*, 367 Ill. App. 3d 548, 557 (2006).

¶ 19      As to the statute of limitations, the common-law discovery rule tolls the commencement of the limitations period until the potential plaintiff possesses sufficient information concerning his or her injury and its cause to put a reasonable person on notice to make further inquiries. *Lama v. Preskill*, 353 Ill. App. 3d 300, 304 (2004). The characteristics of

the alleged negligence and its effect upon the plaintiff in the form of recognizable injury is of particular relevance in this sort of inquiry. A good source of jurisprudence in this area is found in our supreme court's decision in *Golla v. General Motors Corp.*, 167 Ill. 2d 353 (1995).

¶ 20   In *Golla*, our supreme court stated that "where a plaintiff's injury is caused by a 'sudden traumatic event,' such as the automobile accident that occurred in this case, the cause of action accrues, and the statute of limitations begins to run, on the date the injury occurs." *Id*. at 362-63. Although *Golla* explained that "latent" physical injuries may arise in medical malpractice cases where a cause of action does not immediately accrue, such cases involve circumstances where plaintiffs "did not discover they had suffered *any* injury until long after the tortious conduct occurred," which is unlike a case where some sort of injury is immediately apparent. (Emphasis in original.) *Id.* at 367. Our supreme court has further stated that plaintiffs need not know the full extent of their injuries before the statute of limitations triggers, and in fact, "the general rule [is] that the limitations period commences when the plaintiff is injured, rather than when the plaintiff realiz[ed] the consequences of the injury or the full extent of her injuries." *Id.* at 364.

¶ 21   The statute of repose, however, is distinct in that it runs regardless of whether a patient is aware of any negligence at the termination of treatment. *Id.* Our supreme court has acknowledged the "harsh consequences" from such a statutory scheme as it could bar causes of actions even before their discovery; however, the " 'period of repose gives effect to a policy different from that advanced by a period of limitations' " and is " 'intended to terminate the possibility of liability after a defined period of time, regardless of a potential plaintiff's lack of knowledge.' " *Cunningham v. Huffman*, 154 Ill. 2d 398, 406 (1993) (quoting *Mega v. Holy Cross Hospital,* 111 Ill. 2d 416, 422 (1986)). The supreme court further explained that a four-year outer limit on malpractice liability was enacted specifically to curtail "long tail" exposure to medical malpractice claims. *Id.*

¶ 22   The statute of repose, however, could begin to toll at a later date if there was an ongoing course of negligent medical treatment. *Willis v. Khatkhate*, 373 Ill. App. 3d 495, 500 (2007). This requires a plaintiff to demonstrate: (1) that there was a continuous and unbroken course of negligent treatment; and (2) that treatment was so related and continuous as to constitute one continuous wrong. *Id.*

¶ 23   In an attempt at achieving some measure of clarity in this somewhat muddled factual scenario, we will address Hanks' appeal defendant by defendant. First, Dr. O'Neill of Family Practice Health Care was Hanks' family practitioner and he last saw Hank on November 20, 2002. Counts III, XII, XIII, XVI, and XVII relate to Dr. O'Neill, and they allege medical negligence and fraud against Dr. O'Neill and vicarious liability as to Family Practice Health Care under theories of *respondeat superior* and apparent agency.

¶ 24   We first observe that the statute of limitations would bar most claims as to Dr. O'Neill. In March 2003, Hanks had already filed a complaint against other medical treaters relating to the aborted ERCP of April 2002 and the various injuries he allegedly subsequently suffered. Although Hanks argues that certain subsequent injuries to his liver were distinct and separate from those alleged in his 2003 complaint, his 2008 second amended complaint

nevertheless continues to attribute the root cause of his injuries to the aborted ERCP. Furthermore, as stated above, plaintiffs need not know the full extent of their injuries before the statute of limitations triggers. Under the principles outlined above in *Golla*, Hanks was clearly aware of some type of injury at the time of the relevant sudden traumatic event, or the failed ERCP, because he filed a lawsuit as a result. At best, Hanks must have been aware of an injury by the filing of his original March 2003 complaint, and thus the two-year statute of limitations would have run out at the latest by March 2005, several years before the complaint that included O'Neill as a defendant was filed.

¶ 25    Even if we were to agree with Hanks that the applicable statute of limitations somehow did not serve to bar claims against O'Neill, the statute of repose undeniably would. It is undisputed that O'Neill's last meeting with Hanks was on November 20, 2002, and it is also alleged that O'Neill later met with Dr. Wiley-Lucas regarding Hanks' care on January 8, 2003. As stated above, the four-year statute of repose period commences at the termination of treatment regardless of a patient's "awareness." Therefore, any cause of action as to O'Neill would have been potentially time-barred as early as November 20, 2006, but in any event, no later than January 8, 2007, over 20 months before the 2008 complaint was filed.

¶ 26    In an attempt to avoid the application of the statutes of limitation and repose, Hanks argues that O'Neill engaged in various forms of fraudulent concealment. Fraudulent concealment is provided in section 13-215 of the Code (735 ILCS 5/13-215 (West 2008)) as the only exception to the limitations and repose periods in section 13-212(a) of the Code (735 ILCS 5/13-212(a) (West 2008)). It provides:

> "If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards." 735 ILCS 5/13-215 (West 2008).

Our supreme court has clarified this to a degree and held that concealment, as contemplated by section 13-215, must consist of "affirmative acts or representations calculated to lull or induce a claimant into delaying filing of his or her claim, or to prevent a claimant from discovering a claim." *Orlak v. Loyola University Health System*, 228 Ill. 2d 1, 18 (2007). These acts and representations by a defendant must be knowingly false and made with the intent to deceive a plaintiff. *Id.*

¶ 27    As to O'Neill, we first note that the allegation of fraudulent concealment is entirely inconsistent with his referral of the patient to different specialists for further diagnosis. More importantly, however, our review of Hanks' second amended complaint reveals that he alleges that O'Neill withheld information regarding certain unfavorable results from his liver biopsies and the aborted ERCP, and Hanks concludes that this failure to act constitutes fraudulent concealment. These allegations are clearly insufficient to constitute an affirmative act or representation calculated to conceal a cause of action. There is a recognized distinction between a defendant allegedly concealing an injury as opposed to obfuscating a cause of action. *Bloom v. Braun*, 317 Ill. App. 3d 720, 728-29 (2000). The former is insufficient to establish fraudulent concealment. *Id.* Here, there is no allegation that the acts, or perhaps more accurately, the inactions, were calculated or intended to prevent Hanks from

discovering a cause of action. Instead, these were at best allegations of silence, and our supreme court has held that mere silence on the part of a defendant is insufficient to establish fraudulent concealment. *Orlak*, 228 Ill. 2d at 18.

¶ 28 Equally fatal to Hanks' allegations of fraudulent concealment is the fact that he had already filed a complaint in 2003 alleging that the aborted ERCP induced pancreatitis and aggravated his liver condition. Hanks' second amended complaint alleges various acts of negligence on the part of O'Neill in direct relation to the aborted ERCP, which has served as the basis to all of Hanks' claimed damages since 2003. To now argue that he was somehow lulled or induced into not filing a claim based on the aborted ERCP until 2008 due to withheld information is the apogee of disingenuousness. It is well settled that where a reasonable amount of time remains in the applicable limitations or repose period when a plaintiff discovers, or should have discovered through ordinary diligence, a cause of action, section 13-215 will not extend that period. *Kheirkhahvash v. Baniassadi*, 407 Ill. App. 3d 171, 181 (2011); see *Turner v. Nama*, 294 Ill. App. 3d 19, 27 (1997).

¶ 29 Here, it is undisputed that Hanks was aware that he had a cause of action based on the ERCP by March 20, 2003, when he filed his first complaint relating to the matter. His complaint was filed more than four years later. Accordingly, we find that the circuit court properly dismissed all counts against Dr. O'Neill.

¶ 30 Next, we will address Dr. Bajaj of Midwest Gastroenterology Associates. Counts IV, XIV, XV, XVI, XVIII, and XXI of the second amended complaint relate to Dr. Bajaj. The allegations within those counts mirror those that related to Dr. O'Neill.

¶ 31 Bajaj and Midwest Gastroenterology Associates stand in essentially the same position as O'Neill. First, our above analysis regarding the statute of limitations is no different and is adopted here. Second, to the extent Hanks might argue that there are factual questions to be determined as to when the statute of limitations triggered, there can be no question as to when the statute of repose was triggered. Dr. Bajaj's last contact, and thus last treatment, with Hanks was on November 5, 2002, when a second liver biopsy was performed. Therefore, the statute of repose would have run by November 5, 2006, well before the 2008 complaint was filed.

¶ 32 Hanks also advances allegations of fraudulent concealment against Bajaj, but he has again framed these allegations of fraudulent concealment as failures to inform him regarding his injuries, such as allegedly concealing information as to the results of the aborted ERCP and liver biopsies. We reiterate that allegations regarding a defendant's diagnosis of, or failure to diagnose, the nature and gravity of an illness is insufficient to establish fraudulent concealment. *Zagar v. Health & Hospitals Governing Comm'n of Cook County*, 83 Ill. App. 3d 894, 898 (1980). Our above discussion regarding the 2003 complaint in relation to the 2008 allegations of fraudulent concealment as to O'Neill is equally applicable here to Bajaj. Accordingly, we find that the circuit court properly dismissed all counts against Dr. Bajaj.

¶ 33 Count VII of the second amended complaint relates to Dr. Layden and advances an allegation of medical negligence. Hanks asserts that Dr. Layden's treatment was negligent in his failure to properly review certain test results or accurately diagnose Hanks' ailments. This count, however, is also untimely. Again, even if we were to accept Hanks' assertion that

the statute of limitations was not triggered until a much later time, he does not dispute that Layden's last treatment with Hanks was November 26, 2003. The statute of repose would have run by November 26, 2007, nearly a year before Hanks finally filed his 2008 complaint. Accordingly, count VII was properly dismissed as time-barred.

¶ 34       Finally, we consider the counts against Dr. Wiley-Lucas. Counts V, VI, XVI, and XIX relate to Wiley-Lucas. Count V specifically concerns alleged negligence in treatment that occurred during Wiley-Lucas' time at UIMC, which ended in December 2002. Accordingly, the statute of repose had run by December 2006, and thus count V was properly dismissed as time-barred regardless of when the statute of limitations may have been triggered for these allegations. Count XIX contains allegations of fraudulent concealment and suffers similar infirmities as the fraudulent concealment allegations against Dr. O'Neill and Dr. Bajaj. Although Hanks alleges information regarding his alleged injuries caused by the ERCP were improperly withheld from him, it is nevertheless couched in terms of a failure to diagnose, silence, or at worst, a concealment of an injury as opposed to a deliberate concealment of a cause of action. Accordingly, the analysis and discussion above regarding Dr. O'Neill and Dr. Bajaj are applicable to count XIX.

¶ 35       Count VI and portions of count XVI require a slightly more detailed discussion as they address interactions between Dr. Wiley-Lucas and Hanks while she was at Rush in 2004 and 2005. Hanks had visited Dr. Wiley-Lucas previously in 2002 at UIMC for treatment and a liver workup. There was a significant break in their relationship as she transferred employment to Rush, where it is alleged that Wiley-Lucas would not provide further treatment to Hanks and where she had no recollection of previously treating him. Hanks, however, alleges that when he met with Wiley-Lucas during the "spring of 2004" for treatment as well as on August 10, 2005, she was negligent by failing to inform him of previous test results from 2002.

¶ 36       Our decision in *Ferrara v. Wall*, 323 Ill. App. 3d 751 (2001), is instructive here. There, we held that a defendant's failure to notify a patient of abnormal test results did not constitute a continuing course of negligent medical treatment and, thus, the four-year period of repose was triggered at the time the defendant received, and failed to communicate to the patient, the abnormal test results. *Ferrara*, 323 Ill. App. 3d at 756-57. This conclusion reaffirmed our previous decision in *Turner*, which similarly held that a failure to notify a patient of unfavorable medical results did not constitute medical treatment and thus was not a continuing course of negligent medical treatment that might toll a statute of repose. *Turner*, 294 Ill. App. 3d at 31-32. In *Ferrara*, a defendant received certain unfavorable test results in 1993 but did not advise the patient of the test results until 1995. *Ferrara*, 323 Ill. App. 3d at 757. Consistent with the principles stated above, this court rejected the plaintiff's argument that the repose period did not trigger until 1995, but instead began to run in 1993 upon defendant's receipt of the test results. *Id.* Likewise, we must reject Hanks' argument here that any counts in his 2008 complaint regarding Dr. Wiley-Lucas during her time at Rush and her alleged failure to relate or retrieve her previous test results were not time-barred. Dr. Wiley-Lucas' test results were dated December 17, 2002, and thus under *Turner* and *Ferrara*, the statute of repose had run by December 17, 2006, just as it had for count V. Again, because Dr. Wiley-Lucas was not named as a defendant until August 2008, regardless

-10-

of whether counts VI and XVI are time-barred by a statute of limitations, they are certainly time-barred by the statute of repose. Accordingly, all counts against Dr. Wiley-Lucas that were dismissed as time-barred were properly dismissed.

¶ 37                          B. Loss of Society and Consortium

¶ 38    Hanks next contends that this court should recognize the availability of a cause of action for his children's loss of society due to his injuries, which were counts XX and XXI in his second amended complaint.

¶ 39    This contention finds no support in Illinois case law, which Hanks admits does not recognize a cause of action for a child's loss of his or her parent's society due to a nonfatal injury. Our own research reveals we have explicitly and consistently held that no minor has a "cause of action for loss of parental consortium when the parent survives, no matter how seriously the parent is injured." *Karagiannakos v. Gruber*, 274 Ill. App. 3d 155, 157 (1995); see *Van de Veire v. Sears, Roebuck & Co.*, 178 Ill. App. 3d 794 (1989); *Hearn v. Beelman Truck Co.*, 154 Ill. App. 3d 1022, 1023-24 (1987); *Huter v. Ekman*, 137 Ill. App. 3d 733, 735 (1985). In a related vein, our supreme court has held that a parent cannot recover damages for loss of companionship and society resulting from nonfatal injuries to a child. *Vitro v. Mihelcic*, 209 Ill. 2d 76, 88 (2004); *Dralle v. Ruder*, 124 Ill. 2d 61, 66 (1988). We find the supreme court's holding in *Vitro* to be instructive and decline to depart from this court's long line of firmly established precedent on this precise issue. These counts were properly dismissed as having a nonexistent legal basis, and accordingly, the circuit court did not err here.

¶ 40                                    III. CONCLUSION

¶ 41    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 42    Affirmed.